**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

JEFFREY LOEB,

                    Plaintiff,

v.                                          ORDER
                                            Civil File No. 05-720 (MJD/AJB)

BEST BUY COMPANY, INC. and BEST
BUY ENTERPRISE SERVICES, INC.,

                    Defendants.
_____

David L. Shulman, Law Office of David L. Shulman PLLC, Counsel for Plaintiff
Jeffrey Loeb.

Charles O. Lentz, Janet C. Evans, Kari Thoe Crone, Kelly K. Pierce, Lisa L. Heller,
Sara Anspach Poulos, Stacey P. Slaughter, and Joel A. Mintzer, Robins Kaplan
Miller & Ciresi LLP, Counsel for Defendants.

_____


**I.      INTRODUCTION**

        Before the Court is Best Buy's Motion for Summary Judgment on Claims

Raised by Plaintiff Loeb [Doc. No. 29].  Oral argument was heard on December

15, 2006.

**II.     BACKGROUND**

        This case arises out of Plaintiff Jeffrey Loeb's termination of employment.

In February 2000, Loeb was hired as an information services ("IS") program

manager, and was assigned to manage various projects within the company.  Loeb

1

was forty-four years old at the time he was hired.  On or about July 2001, Loeb was promoted to the position of IT leader, a position he held until January 2003 when he returned to an IS program manager position.  Loeb received "exceeds expectations" on his performance reviews in 2002, 2003, and 2004.

During this time, Best Buy had a retail operations model called "customer centricity."  Best Buy's customer centricity plan was an effort to focus the sale of merchandise to customer groups with certain profiles.  One of these groups focused on selling to a fictitious customer named "Barry" who had an interest in high-end merchandise.  Beginning in mid 2003, Julie Gilbert was the lead on the Barry team.  Other Barry team leaders were Dean Kimberly and Shawn Score, both of whom eventually left the team to take other positions within Best Buy. Members of the Barry team were selected from other Best Buy departments because they had specific knowledge or talent that would promote the goals of the team.  Most of the members of the Barry team were not paid from the Barry budget code because they were considered "shared resources" who were effectively "loaned" to the Barry project from other Best Buy departments.

During the second half of 2003, the Barry team decided to focus its efforts on building a "store within a store" to sell high-end home theater products and services.  The concept was eventually dubbed the Magnolia Home Theater Store ("MHT").  The team's goal became to open two prototype "lab" stores-within-

stores by May 2004 that, if successful, could be replicated on a very large scale in Best Buy stores around the country.  These first stores were intended to serve as labs, allowing the team to refine the best methods for incorporating the MHTs into existing Best Buy stores.  The job of designing, building, and opening the MHTs in such a short time involved coordination of many existing Best Buy groups such as real estate, design, construction, merchandising, inventory, and sales.

Loeb, who was working on customer centricity programs at the time, asked Gilbert if the team could use his help on the project.  There was no posting for any job on the Barry team.  Gilbert and Kimberly agreed to bring Loeb onto the team to serve as a coordinator of the various groups working on the MHT lab stores. Loeb was forty-eight years old at the time, but neither Kimberly nor Gilbert knew Loeb's age.  At first, Loeb was a "shared resource" and reported to an IS supervisor, but in April 2004, he was officially moved to the Barry team cost center and began reporting directly to Kimberly and Gilbert.  Shortly before he officially joined the team, Loeb expressed an interest in having his role on the team formalized with a written job description and title.  Loeb drafted a document that described his role on the team.  Gilbert agreed that the document "generally . . . described his role as the person conducting the work of the various groups that we needed to put together the MHT store-within-a-store concept."

3

(Gilbert Aff. ¶ 8.)  This document was the only written description of Loeb's MHT

position.  Loeb identified the following roles and responsibilities for himself:

**Business Planning and Execution**
Manage all IOM planning and execution.  Insure integration across
Barry IOM team, Barry CC stores, corporate business functions, and
"core" store initiatives.
• Provide day-to-day work direction for the Barry IOM team
• Publish integrated Barry business calendar on a weekly basis
• Develop and manage a business planning process
• Lead a monthly Barry business review
• Provide a weekly status report/snapshot of Barry activity
• Monitor and archive Barry H/T/V activity and results

**Store Execution**
**Launch – Represent the Barry team in Launch activities.**
• Communicate segment information to the Launch Team
• Provide prioritization and direction to the Launch Team
• Communicate Launch progress to the Barry Leadership Team

**Transition from Test – Manage the process to transition successful
value propositions out of the test stores into Barry stores**
• develop a process to measure VP H/T/V success and readiness
  for export to other Barry stores
• Schedule and prioritize VP transition timeline
• Monitor and report on transition progress

**New technology – Head a multi-function working group to integrate
new technologies into seamless Value Propositions for Barry**
• Lead regularly scheduled meetings to develop new, [sic]
  technology related VP for Barry
• Develop a process for making these deployable, supportable,
  and profitable
• Partner with Lab store to deploy for testing

**Strategy**
Key participant in formulating strategy for the Barry segment.

4

**Ad Hoc**
**Carry out other assigned ad hoc duties as assigned. Represent**
**leadership where requested.**
•     Manage and direct the activities of a Project Manager

(Schulman Aff. Ex. I) (emphasis in original).

Loeb worked full-time on the MHT project, and was successful in that position.  Loeb was the oldest person on the Barry team.  Gilbert testified that at the time Loeb was transferred to the Barry team cost center, his position was not intended to be temporary.  (Gilbert Dep. 115.)

The Barry team had a strong "team" concept in which all members were required to participate in "Barry huddles" which were much like sports team huddles that ended with a "cheer of the day."  The management concept also included such things as "partnering with people, lack of hierarchy, very, very feelings-based [management] . . . . more 'new age.'"  (Loeb Dep. 156.)  All Barry team members were required to participate in these management techniques regardless of their age.

The two original MHT stores were opened by May 2004, and the project was expanded so that two more MHT stores were opened by August 2004.  By the time the second set of stores opened, this phase of the MHT project had come to an end.  (Loeb Dep. 76; Gilbert Aff. ¶¶ 12-13; Kimberly Aff. ¶ 8.)

Once the four prototype stores were successfully opened, Best Buy concluded that the MHT store-within-a-store concept was a success, that the strategy and design work regarding the prototypes was at an end, and that the team had created a successful "recipe" that could be replicated in other Best Buy stores.  Thus, the Barry team now focused on actually replicating the successful prototype into other stores around the country, a shift to what was called "scale-up mode."

In August 2004, Barry team leaders told Loeb that with the completion of the MHT lab store project, the nature of the MHT work was going to change, and since there would be a shift in the type of work being done by the Barry team, there would not be a place for Loeb on the team.  Gilbert felt that Loeb was not interested in "routine, nuts and bolts type work of processing the building of large numbers of MHT stores, according the 'recipe' we had prepared.  He . . . was interested in more high level strategic types of projects."  (Gilbert Aff. ¶ 13.) Kimberly and Gilbert believed that, based on conversations with Loeb that Loeb would not be happy working on the "scale-up" project going forward.  (Id.; Kimberly Aff. ¶¶ 9, 10; Loeb Dep. 109-10.)  At this time, Kimberly told Loeb that since his work on the MHT project was coming to an end, he should begin looking for work elsewhere within Best Buy or outside the company.  Kimberly and Gilbert

agreed to talk to Best Buy's HR department so that Loeb was given a reasonable opportunity to find work elsewhere within Best Buy.

Loeb was surprised by the professed lack of work because at this time customer centricity was "at the center of everything [Best Buy did]."  (Pl. Mem. Opp. Mot. Summ. J. at 11 (citing Shulman Aff. Ex. AA at 1) (brackets in original).)  Best Buy planned to maintain eighteen lab stores, open eighty Barry stores in the following year, and open 120 more Barry stores in the next two years.  In addition, there existed a three-year strategy for the Barry team that included the continued development of "value propositions" involving everything from dedicated check-out areas and telephone lines to private experience areas. (Shulman Aff. Ex. AA, BB.)

On September 23, 2004, Loeb was given an official 60-day notice of termination if he was unable to secure other employment within Best Buy.  The termination notice was signed by H.R. Vice President Randy Ross, and stated that the termination was the result of the need to "reduce the labor costs" at its corporate campus.  (Id. Ex. R.)   A memo from HR Director Karen Dekker stated that Loeb's position was eliminated as part of a reorganization designed to "streamline processes and eliminate redundant tasks."  (Id. Ex. S.)  Best Buy's Senior Corporate Council, Jane K. Kirshbaum, informed the EEOC that Loeb was terminated "as a result of staff reduction."  (Id. Ex. U at 1.)  In a staffing analysis

worksheet completed in September 2004, Gilbert stated that Loeb worked with
the Barry team to "coordinate that launch of the first four Magnolia Home Theater
stores in California.  This work started in January, and was effectively completed
by mid-September.  At this point, the leadership of the Barry team has determined
that Jeff's current role is no longer needed on the team, since MHT is now in
scale-up mode (as opposed to launch mode)."  (Id. Ex. Q.)

        Although he made several contacts within Best Buy seeking another
position, and Gilbert talked to a number of people within Best Buy on his behalf,
Loeb did not find another job at the company and was terminated on November
24, 2004.  On the day after he was terminated, Mike Keskey, President of Best
Buy's U.S. Retail Stores, wrote Loeb a letter thanking him for his contributions
and complimenting him on a job well done.  According to Best Buy's answers to
requests for admissions, at the time Loeb was terminated, it was "likely" that there
were job postings within Best Buy for which he met the minimum requirements.
(Id. Ex. X at 17.)  Gilbert testified that even if Loeb had expressed a desire to do
the type of work Barry was now doing, he likely could not have kept working with
the team because the detail-oriented work and launch coordination was actually
now housed outside of the Barry team.  (Gilbert Dep. 52-53.)

        At one point during Loeb's employment on the Barry team, Gilbert asked
Loeb how old he was and registered surprise because he looked and acted

younger than his age.  (Loeb Dep. 118.)  This was the only comment that Gilbert ever made regarding Loeb's age.  (Id.)  Kimberly never said anything that made Loeb think he was prejudiced against older people.  (Id.)

In approximately October 2004, Gilbert sought to add a position called "Segment Team Member; Ideation/Innovation" which would take over some of the responsibilities that Kimberly was handling in connection with store and field retail staff such as brainstorming and innovation of new ideas for the Barry customer.  The position was posted both internally and externally in early 2005. Loeb did not apply for this job.  (Kimberly Aff. ¶ 16.)

The Segment Team Member was to have the following duties:

1. **Assists in the Development and Execution of Segment Strategy**
   - Supports the Segment Leader in the implementation and on-going refinement of the segment strategy including a primary focus upon segment value propositions elements (VPEs)
   - Highly conceptual, ability to anticipate customer needs based on data/analysis, predictions etc[.]
   - Integrating and teaching the Hypothesis, Test, Verify (HTV) component of the data collection and interpretation.  Data drives decision-making: understanding, interpreting and assist in making decision against data inputs
   - Assists in assessing results against value proposition and initiating needed course corrections
   - Ability to think and integrate inputs systemically (financials, consumer, market and cultural data)
   - Assists in connecting with key departments as appropriate to build and refine value propositions.

**2.    Demonstrate Excellent General Management Skills**
- Supports/Assists/Drives the activities of the IOM teams to ensure accurate execution of the VPEs and support for the segment requirements
- Facilitates partnerships with platform teams to enable execution of value propositions
- Demonstrates ability to quickly surface learnings, make adjustments, and teach others the what, why and do
- Successfully manages in a matrix organization; demonstrates effective partnerships with Business Teams, COEs, Merchants, Hub, Inventory, etc. . . to validate and iterate value propositions
- Assists with building and developing human capital required to drive results

**3.    Customer Identification, Satisfaction, and Experience**
- Supports/Responsible for the identification of the segment customer as well as improving customer satisfaction
- Assists with the validation of assumptions about customer experience including integrating HTV for customer identification, satisfaction and experience and the ability to iterate processes to enhance results.

**4.    Integration of Corporate and Field Segment Employees**
- Teach CC philosophy to all levels of employee including store to peer.
- Systematically learn from stores and evolve customer strategies.

**5.    Demonstrate Excellent Financial Acumen**
- Development, understanding and budgeting of financial metrics not historically part of BBYs financial portfolio – ROIC, NOPAT
- Responsible for segment P&L – influence on platform P&L
- Budgeting responsibility for segment specific and platform specific outcomes
- Financial accountability for defined segment across all stores

10

- Teaching financial acumen to a wide range of team members – Store to Peer accountability

(Schulman Aff. Ex. E) (ellipses and emphasis in original).

D.M., a seventeen-year Best Buy employee, was promoted to the Segment Team Member position in March 2005.  At the time, D.M. was forty-one years old, seven years younger than Loeb.  The Segment Team Member position required D.M. to take over Kimberly's duties when Kimberly moved to another position. D.M. runs the Barry lab stores and her work is "strategic . . . with a heavy operations bent."  (Gilbert Dep. 122; Kimberly Dep. 108, 145.)  The Barry labs continued to operate after the launch of Magnolia so that Best Buy could continue to come up with new ideas for their Barry customers.  (Gilbert Dep. 123.)

In July 2005, Best Buy created the position of Director, Innovation – Barry Segment.  The position was never posted, either internally or externally, and Best Buy employee P.M. was assigned to the position.  In this position, P.M. was in charge of "launch[ing] new concepts/relevant 'themes' in a lab environment." (Shulman Aff. Ex. HH.)  P.M.'s role was potentially long-term, even though his program would go from launch to scale-up if successful.  (Gilbert Dep. 126-27.) P.M. was forty-one at the time he was hired for this position, and had one disciplinary item and one poor performance notice in his personnel file at the time.  (Shulman Aff. Ex. LL, MM.)  Gilbert testified that even had Loeb still been

with Best Buy at this time, he would not have been considered for the position

because Loeb lacked the "field level" retail experience necessary for the job.

(Gilbert Dep. 127; Gilbert Aff. ¶¶ 18, 19.)   The key responsibilities of the position

follow:

1.     This role has major responsibility to influence future direction
       of the company.  I.e, new businesses, formats/concepts

2.     CCC management – Coordinates and determines
       interdependencies of all innovation projects from the IOM and
       Field Teams.  Work in an ambiguous direction and
       demonstrate leadership capabilities.  Prioritized tracking and
       progress to support innovation Leadership direction on
       Portfolio management decisions.  Ensure Success metrics are
       identified as it relates to game changing ideas for innovation.
       Ideas are managed and conclusions are made from the data.
       Maintain and share key learning's documentation with ALPS,
       vendors, retail, IOM, CC program, and senior leadership.

3.     Strong Customer Orientation – Leverages customers field
       partners, vendors and other strategic partners for customer
       knowledge.  Concept development focused on strong customer
       orientation and how to apply relevant technology offerings to
       innovation/solutions.

4.     Innovation Development – Utilize customer insight to develop
       new concepts and solutions to serve our customer base.  Lead
       field innovation sessions with strategic partners.

5.     Demonstrate Excellent General Management Skills –
       Successfully influence in a matrix environment with clear
       communication, follow-up, and focus on the evaluation of
       innovation experiments.  Maintain communication link
       between Segment Leadership and IOM team members.
       Demonstrates ability to quickly surface learning's, make
       adjustments, and teach others the what, why and do.

> Facilitates partnerships with platform teams to enable execution of innovation propositions.

> 6. Financial Acumen – Customer P&L responsibility, Adept in customer metrics and CC financial metrics including ROIC. Ability to develop partnership approach and evaluate new innovation ideas to drive end result.

> 7. Integration of Corporate and Field Segment Employees – Teach CC philosophy to all levels of employees including store to peer.  Systematically learn from stores and evolve innovation strategies.

> .    .    .
> Interfaces with Company executives SVP and VP levels and their teams.
> .    .    .
> Manages a function without direct supervision of people (may have a budget responsibility)

(Schulman Aff. Ex. HH at 1-2.)  The job requirements included eight to ten years experience in "[r]etail/ecosystems to explore and how to mange this space. Customer research, Project Management/Program Management/Retail Operations/Test and Measurement in Innovation space, Process Management. (Id. at 2.)

The innovation and invention work eventually led to the creation of another new retail concept: the Magnolia Stand-Alone Home Store.  The concept of this store was "sketched out" by May 2005 and at that same time the work of designing, building, staffing, and stocking the new lab store began.  The Magnolia stand-alone lab was completed in January 2006.  P.M. has a "very retail-focused

operations role" that requires him to create an incentive plan designed to "forward" Barry customers from regular Best Buy stores to the stand-alone home stores.  (Gilbert Dep. 126.)

Loeb filed this lawsuit in April 2005, claiming that his termination was based on age discrimination and therefore violated the Age Discrimination in Employment Act ("ADEA") and the Minnesota Human Rights Act ("MHRA"). Specifically, Loeb alleges that Kimberly and Gilbert used his age as an improper basis for termination.  Loeb feels that he was not only qualified for the positions eventually filled by P.M. and D.M. and that he was lied to when he was told he was not qualified for the scale-up positions within Barry, but also that P.M.'s and D.M.'s positions are very similar to the position he held on the Barry team.

## III.    DISCUSSION

### A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Id.</u> at 323.  Summary judgment must be granted when the opposing party fails to make a showing that supports the existence of an element

14

essential to the case and on which the opposing party bears the burden of proof at trial.  Id. at 332-33.  Summary judgment should seldom be used in employment discrimination cases.  Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.   MHRA and ADEA Claims

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  The protections of the ADEA apply to individuals age forty and over.  Under the MHRA, it is an unfair employment practice for an employer to discharge an employee because of the employee's age.  Minn. Stat. § 363A.08 Subd. 2(b).  Both MHRA discrimination claims and ADEA claims are analyzed under the familiar burden-shifting analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 141 (2000) (ADEA claims); Keathley v. Ameritech Corp., 187 F.3d 915, 919 (8th Cir. 1999) (same); Hoover v. Norwest Priv. Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001) (MHRA claims).

Under McDonnell Douglas, in the absence of direct evidence of discrimination, the plaintiff bears the initial burden of proving a prima facie case of discrimination.  411 U.S. at 802.  The defendant then has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment

15

action.  Id.  Finally, to prevail, the plaintiff must show that the defendant's proffered reason was a pretext for discrimination.  Id. at 804.  Although the burdens shift between the parties during this analysis, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Reeves, 530 U.S. at 143 (citation omitted).  Federal precedent may be used to construe the MHRA.  Reiff v. Interim Personnel, Inc., 906 F. Supp. 1280, 1292 (D. Minn. 1995) (citations omitted).

### 1.    Prima Facie Case

To prove a prima facie case of age discrimination, a plaintiff must satisfy the following four elements: (1) he is a member of the protected class by being age forty or over; (2) he was meeting his employer's job expectations; (3) he was discharged; and (4) he was replaced by a younger person after the discharge.  See Keathley, 187 F.3d at 920.

### a.    First Three Elements

Best Buy admits that Loeb satisfies the first three elements of his prima facie case.  The only element at issue is whether Loeb was replaced by a younger person after discharge.

16

**b.**   <u>**Replacement by a Younger Person**</u>

An age discrimination action may be maintained based on discrimination between older and younger members of the protected class. <u>Rinehart v. City of Independence</u>, 35 F.3d 1263, 1265-66 (8th Cir. 1994). To satisfy the fourth element of the prima facie test, a plaintiff must create a fact issue as to whether he was "replaced by a person sufficiently younger to permit an inference of discrimination." <u>Id.</u> at 1269 (citation omitted) (emphasis omitted). At this stage of the analysis, a plaintiff must demonstrate that a fact issue exists as to whether age was a factor in the decision to terminate him. <u>Bashara v. Black Hills Corp.</u>, 26 F.3d 820, 825 (8th Cir. 1994). The standard is flexible, depending upon the facts giving rise to a particular dispute. <u>Keathley</u>, 187 F.3d at 920.

"The overwhelming body of cases in most circuits has held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination prima facie case." <u>Grosjean v. First Energy Corp.</u>, 349 F.3d 332, 338 (6th Cir. 2003) (collecting cases). The Eighth Circuit has not drawn a bright line, but has opined that a nine-year age difference between a plaintiff and his replacement "may not be sufficient to infer age discrimination." <u>See</u> <u>Girten v. McRentals, Inc.</u>, 337 F.3d 979, 982 (8th Cir. 2003) (reasoning that in the Eighth Circuit, a five-year age difference is insufficient to

17

infer age discrimination, but a fourteen-year age difference is sufficient to infer

age discrimination) (citations omitted).

Loeb argues that the jobs filled by D.M. and P.M. are "consistent with the

role [he] was playing" at Best Buy and that the positions all appear to be

"similar." (Loeb Dep. 145-47.)  Loeb argues that both D.M. and P.M., seven and

eight years younger than Loeb respectively, were hired to replace him and that

the age differences between he and D.M. and P.M. are sufficient to permit an

inference of age discrimination.  Loeb further argues that D.M. and P.M. took over

his Barry team duties, that funding for D.M.'s position was approved while he was

still employed at Best Buy, and that his position on the Barry team was never

limited to the launch of the first four stores.

Loeb takes particular issue with the similarities between his job description

and D.M.'s job description, noting that the main focus of both jobs was

"developing and implementing the segment strategy through value propositions."

(Pl. Mem. Opp. Mot. Summ. J. at 23.)  Loeb argues that since both positions are

"strategic" in nature, he has established that D.M. took over his job duties.

Loeb also argues the P.M. took over his old job duties since both positions

involve formulating strategy for the Barry segment.  According to Loeb, managing

the lab store process and working with other parts of Best Buy make this position

significantly similar to his position such that there is an inference of age discrimination.

Lastly, Loeb argues that his position involved more than just the launch of the first lab stores since his job description contained no such time limit.  Loeb directs the Court's attention to the clauses in the job description stating that Loeb would participate in "segment strategy development and the ongoing development of value propositions," and that he had responsibility for developing and managing a business planning process.  In addition, Loeb notes that Gilbert testified that Loeb's job was not considered temporary.  Loeb also asserts that the Barry huddles and other management choices, such as the peer evaluations and lack of an established hierarchy, created a culture favoring younger employees.

The Court finds that Loeb was not replaced by D.M. and P.M.  As the Barry project moved onto its next phase, new positions were created and D.M. and P.M. filled those jobs.  Loeb's job was eliminated.  More importantly, there is no evidence that age was a factor in the decision to terminate Loeb.

Loeb seems to argue that he had the talents to fill D.M.'s and/or P.M.'s positions, positions that were not filled until months after Loeb was terminated. The Court does not find the fact that Gilbert received funding for D.M.'s job while Loeb still worked at Best Buy particularly troubling.  It makes sense that new positions must be sufficiently funded before they can be filled.  While it may have

been prudent or wise for Best Buy to keep Loeb on the payroll, the Court cannot sit as a "super-personal department," and must not review the wisdom or fairness of business decisions, except to the extent those decisions are intentionally discriminatory.  See Girten, 337 F.3d at 983 (citation omitted).

In addition, the Court does not agree that Gilbert and Kimberly lied to Loeb regarding the type of work the Barry project would entail in the future.  The evidence supports the finding that Gilbert and Kimberly did not think Loeb would be interested in the future work of the Barry team.  Even if Loeb would indeed be satisfied doing this work, that does not support a finding of purposeful age discrimination.  If anything, it is a misunderstanding about Loeb's aspirations.  This is especially true regarding D.M.'s job since the job was posted externally, and Loeb did not apply for the position.

The only evidence even remotely indicating age discrimination is Gilbert's comment that Loeb did not look his age.  There is no other evidence of any age-related comments made by Gilbert or any other member of the Barry team, and thus this single comment is not strong evidence of discrimination.  See Hindman v. Transkrit Corp., 145 F.3d 986, 993 (8th Cir. 1998) (reversing trial court's grant of summary judgment to employer because, inter alia, plaintiff's superiors made derogatory age-related comments to plaintiff over the course of many years).

In context, the one comment was nothing more than a stray remark that has no legal significance because the remark was isolated and not repeated, was not indicative of any kind of motive to rid the Barry team of people over forty, and was not made in connection with any decision-making process.  See Girten, 337 F.3d at 983.  Moreover, it is undisputed that Gilbert made contacts on Loeb's behalf trying to find him other jobs at Best Buy once he was given his termination notice.  (Gilbert Aff. ¶ 14; Kimberly Aff. ¶ 11.)  This type of help does not support a finding of age bias.[1]

Thus, without stronger evidence, the seven- and eight-year age differences between Loeb and P.M. and D.M. are insufficient to establish a prima facie case of age discrimination.  As discussed above, the evidence in this case is not strong enough to meet this standard.

---

[1] At oral argument, Loeb's Counsel proffered the affidavit of Gerald Nanninga in which Nanninga states that in 2003 a friend of his interviewed with Gilbert for a job at Best Buy.  (Nanninga Aff. ¶¶ 6, 7.)  According to Nanninga, Gilbert told Nanninga's friend that she wanted to hire someone "'young' who did not have the 'old way' of doing things."  (Id. ¶ 8.)  Nanninga's friend did not get the job, although Nanninga considered his friend qualified for the position.  (Id. ¶¶ 9, 10.)

This evidence is inadmissible.  The statements contained in Nanninga's affidavit are hearsay, and Loeb has not attempted to explain how it is admissible.  See United States v. 3234 Washington Ave. N., No. 03-CV-5765 (JNE/FLN), 2006 WL 487863, at *6 n.3 (D. Minn. Jan. 27, 2006) (unpublished) (citing Erickson v. Farmland Indus., Inc., 271 F.3d 718, 728 (8th Cir. 2001)).  In addition, Nanninga has no personal knowledge about Gilbert's comments and the affidavit is deficient for that reason also.  See Fed. R. Civ. Pro. 56(e).

Lastly, the Barry huddles, team-building exercises, partnering work, and lack of hierarchy within the Barry team are not evidence of a youthful culture or a culture that is hostile to older workers.  Rather, these were merely management techniques that applied to all Barry team members equally, regardless of age.  The fact that Loeb was embarrassed by this "cheerleader" attitude does not mean that the techniques were adopted for the purpose of making older workers uncomfortable, and Loeb has proffered no evidence to support such a finding.

Therefore, Loeb has not stated a prima facie case because he has not demonstrated that he was replaced by younger workers and there is no evidence that the termination decision was based on age.  Thus, Best Buy's motion will be granted on this basis.  Moreover, even if Loeb had stated a prima facie case, the motion would still be granted.

### 2.    Legitimate Nondiscriminatory Reason for Termination

Best Buy argues that it terminated Loeb after giving him ninety days to find a new job within Best Buy because the kind of work the Barry team would do going forward was not the type of work Loeb did on the Barry team.  Gilbert and Kimberly did not think that Loeb would be interested in doing the new work of team.

This is an appropriate legitimate nondiscriminatory reason for terminating Loeb.  The burden now shifts to Loeb to prove that this reason was actually a pretext for age discrimination.

### 3.    <u>Pretext</u>

Once an employer states a nondiscriminatory reason for its actions, a plaintiff can survive summary judgment "only if the evidence considered in its entirety (1) create[s] a fact issue as to whether [the employer's] proffered reasons are pretextual <u>and</u> (2) create[s] a reasonable inference that age was a determinative factor in the adverse employment decision." <u>Lewis v. St. Cloud State Univ.</u>, 467 F.3d 1133, 1137 (8th Cir. 2006) (emphasis in original).  This requires more than just discrediting the employer's stated reason for the termination.  <u>Kohrt v. Midamerican Energy Co.</u>, 364 F.3d 894, 898 (8th Cir. 2004).  Rather, the plaintiff must also "prove that the proffered reason was a pretext for age discrimination." <u>Id.</u>  The real issue is whether the plaintiff was "the victim of intentional discrimination." <u>Reeves</u>, 530 U.S. at 153.  "[I]f the proffered reason [for termination] is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination." <u>Bassett v. City of Minneapolis</u>, 211 F.3d 1097, 1107 (8th Cir. 2000) (citation omitted).  To that end, "shifting" reasons for termination can provide a basis for finding pretext.

23

Galambos v. Fairbanks Scales, 144 F. Supp. 2d 1112, 1122 (E.D. Mo. 2000).  See also Kobrin v. University of Minnesota, 34 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext.").

Loeb proffers several reasons why Best Buy's stated reasons for terminating him were actually pretext for age discrimination.  First, Loeb asserts that Best Buy has proffered shifting reasons for terminating him.  Second, Loeb argues that he was replaced by younger workers who are doing the same work he did on the Barry team.  Third, Loeb avers that P.M. was less qualified than he for this job.

### a.   Shifting Reasons

Loeb argues that Best Buy has proffered shifting reasons for terminating him.  Specifically, Loeb cites the following six statements Best Buy used to explain his termination, and argues that based on the record, each reason is merely pretextual.

(1)   It terminated Mr. Loeb's employment "to reduce the labor costs" and "to reduce [its] headcount."
(2)   It terminated Mr. Loeb as part of a reorganization intended "to streamline processes and eliminate redundant tasks."
(3)   It terminated Mr. Loeb as part of a "staff reduction."
(4)   It terminated Mr. Loeb because his role ended as the result of the Magnolia stores switching to scale-up mode.
(5)   It terminated Mr. Loeb because he agreed to be terminated based on his lack of interest in scale-up work.
(6)   Mr. Loeb was not qualified to perform the strategic work going forward.

24

(Pl. Mem. Opp. Mot. Summ. J. at 27)  (citations to record omitted)  (brackets in original).

### i.      Reasons 1 through 3

In Loeb's termination letter, V.P. of Human Resources Randy R. Ross stated that Loeb was terminated as a result of Best Buy's need to "reduce labor costs" and to "reduce our headcount."  (Shulman Aff. Ex. R.)  Loeb refers to this as shifting reason 1.

An internal memo from Karen Dekker, Director of Human Resources, stated that Loeb's position was eliminated as part of Best Buy's reorganization efforts which included efforts to "streamline processes and eliminate redundant tasks." (Id. Ex. S.)  This is reason 2.

On March 8, 2005, in response to an EEOC request for information regarding Loeb's termination, Jane K. Kirshbaum, Best Buy's Senior Corporate Counsel, stated that Loeb was terminated as part of a staff reduction based on business needs.  (Id. Ex. U.)  This is reason 3.

Loeb proffers the deposition testimony of Best Buy Human Resources Generalist Jeffrey Jergerian, who testified that Loeb's termination actually had nothing to do with lowering labor costs; was not intended to reduce headcount, and indeed did not reduce headcount; and did not eliminate redundancies.

(Jergerian Dep. 58-61, 65.)  Jergerian testified that Loeb was terminated because Loeb's type of work was ending on the Barry team.  (Jergerian Dep. 54.)  Loeb also notes that Kimberly agreed that Loeb was not terminated as part of a reduction in headcount.  (Kimberly Dep. 128-30.)  Loeb argues that at the time he was terminated, Best Buy was actually increasing spending and headcount on the Barry team.  (Shulman Aff. Ex. P, X, QQ, RR, TT.)  Thus, according to Loeb, reasons 1, 2, and 3 for his termination are false and Loeb is entitled to an inference that Best Buy discriminated against him.

The Court need not consider reasons 1 and 2.  The relevant reasons in this case are the reasons of the decision-makers.  See Smith v. Ashland Inc., 179 F. Supp. 2d 1065, 1070 (D. Minn. 2000), aff'd 250 F.3d 1167 (8th Cir. 2001).  Loeb admits that the decision to terminate him was made by Gilbert and Kimberly, not by Ross and Dekker.   (Loeb Dep. 112.)  The Court must examine Gilbert and Kimberly's motives, and there has never been any indication that they terminated Loeb for any reasons other than that the Barry team was moving into the scale-up mode, the type of work the team was going to do going forward was different from the type of work Loeb had done for the team, and that the work would be of a type that would not interest Loeb.  This is supported by Jergerian's testimony. (Jergerian Dep. 43.)

Best Buy also takes issue with Loeb's reason 3 – the EEOC letter.  While it is true that the March 8, 2005 correspondence states that Loeb was terminated "as a result of staff reduction," that "the decision to eliminate his position was made by Julie Gilbert and Dean Kimberly," and "[h]is employment was terminated due to the elimination of his position," the letter also states that "[r]esponsive information will follow under separate cover."  (Shulman Aff. Ex. U at 1-2.)  The responsive information is included in a separate letter dated the same day and signed by the same Best Buy corporate counsel.  (<u>Id.</u> Ex. V.)  That letter makes it very clear that Loeb was terminated because the type of work he had done on the Barry team was no longer needed.  For example, the letter states that Loeb was terminated "based on the completion of a project and the subsequent elimination of his position"; and that the project Loeb worked on, namely "coordinating the launch of the first four Magnolia Home Theater stores in California . . . . was completed in September 2004 as the initiative had moved from 'launch' mode to 'scale-up' mode."  (<u>Id.</u> at 1-2.)  The letter goes on to state that once the project was in scale-up mode, "the work that had been done by Mr. Loeb was no longer needed."  (<u>Id.</u> at 2.)  The letter explains that during the months Loeb worked on the Barry team, his former IS position was eliminated as the result of Best Buy's transfer of IS jobs to a company called Accenture.  (<u>Id.</u>)

There is no inconsistency in these two documents.  The "staff reduction" that Loeb seems to be arguing is purely fictional, was actually the elimination of his job because that type of work was no longer available on the Barry team. Loeb's selective quoting from the two letters, which were written on the same day and authored by the same person, is disingenuous.  The two letters must be read together to get the whole picture, especially since one letter specifically refers to the other one.

The Staffing Analysis Worksheet completed by Gilbert on September 9, 2004 supports Best Buy's stated reason for terminating Loeb.  The worksheet states that Loeb's "current role is no longer needed on the team, since [Magnolia] is now in scale-up model (as opposed to launch mode)."  (Shulman Aff. Ex. Q.) Thus, reasons 1 through 3 are not evidence of pretext.

### ii.    <u>Reasons 4 and 5</u>

Loeb takes issue with reason 4, that he was terminated as a result of the switch to the scale-up of the Magnolia stores, and reason 5, that he "agreed to be terminated based on his lack of interest in scale-up work."  Loeb seems to be arguing that taken in context with all the other stated reasons for his termination, the Court cannot possibly believe that the end of launch work and his apparent lack of interest in scale-up work were actual reasons for terminating Loeb.

Loeb relies heavily on a portion of Gilbert's deposition in which she stated that the overall coordination of the scale-up was done outside the Barry team. Gilbert made this statement at a point in her deposition where she was being asked if she could have kept Loeb on the team going forward.  (Gilbert Dep. 52-53.)  Gilbert testified that it would have made no sense to keep someone on the team who would have been "pursuing [the] kind of detailed work" Loeb had done when there was "another team in the company" doing that work.  (<u>Id.</u> at 53.)

Loeb also argues that since his job description was not limited to the start-up stores, Best Buy's stated reason for terminating him, that the Magnolia work had shifted into scale-up mode, was merely pretextual.  In addition, Loeb avers that since Gilbert testified that she would have terminated Loeb even if he had expressed an interest in staying on the team and that the Barry team was not handling a lot of the scale-up, her statement that Loeb was not interested in scale-up work was pretextual.

Best Buy responds that there was no reason to keep Loeb on the team because once the Magnolia stores went into to scale-up mode, several Best Buy groups were involved, and that the majority of the actual work of replicating the stores was done outside the Barry team in spite of the fact that the Barry team leaders still had substantial responsibility for guiding the scale-up work.  (Second Gilbert Aff. ¶¶ 2-4.)

29

In addition, Best Buy argues that reason 5, that Loeb "agreed to be terminated" is simply not true since Gilbert testified only that Loeb understood there was no position for him on the Barry team.  Furthermore, Gilbert testified that Loeb was terminated because he was not interested in scale-up work.  Gilbert and Kimberly both testified that Loeb was terminated because the work of the Barry team was changing.  Thus, according to Best Buy, the reasons were merely elaborations of Best Buy's stated reasons for terminating Loeb, not different reasons.

Although Loeb argues that one of the reasons given for his termination was "lack of work" (Pl. Mem. Opp. Mot. Summ. J. at 2), Loeb admitted in his deposition that he was informed that rather than there being a lack of work, there was actually going to be a shift in the "type of work" on the Barry team, and that team leaders did not see a place for him on the team where he would be happy going forward.  (Loeb Dep. 109.)

Best Buy has been consistent in its stated reason for terminating Loeb. First, reason 4 is consistent with Best Buy's arguments, and therefore, is not "shifting."  Second, reason 5 is unsupported.  No one ever stated that Loeb agreed to be terminated, only that he understood the nature of the work was changing and that he understood there would no longer be a place for him on the team because the new work would not be of interest to him.

30

### iii.   **Reason 6**

Loeb argues that reason 6, that Loeb was not qualified for the strategic work of the Barry team going forward, is only an after-the-fact attempt to justify the termination because there are no contemporaneous records to support this claim.  Specifically Loeb argues that the strategic work of the Barry team after the launch of the original four stores included lab store tests, analyses and "value proposition development."  Loeb points to Best Buy's desire to design "private experience areas," to create dedicated check outs, and to bundle high-end products.  According to Loeb, these strategies contradict Gilbert's testimony that once the four stores were launched, the Barry team was not changing the stores anymore because it "had the recipe already nailed down."  Loeb argues that his success with the launch of the Barry stores is evidence that he was qualified to do the type of work the team was doing after his termination.

Reason 6 is consistent with the reasons Best Buy gave for the termination, and thus does not represent any sort of suspicious shift.  Gilbert testified that "the high-level strategic coordination work that [Loeb] enjoyed was no longer available."  (Gilbert Dep. 48.)  See Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 855 (8th Cir. 2005) (finding that while substantial changes over time in proffered reasons for termination can support a finding of pretext, this does not mean that

the employer "cannot elaborate on its proffered reason").  There are no

inconsistencies in the reasons given by the decision-makers in this case.

### iv.   <u>Conclusion</u>

Loeb's six "shifting reasons" do not establish pretext.  Reasons 1 and 2 are

irrelevant to this discussion.  Reason 3 is taken out of context, and is not suspect

when evaluated in its entirety.  Reason 5 is a misstatement of the facts.  Reasons 4

and 6 are consistent with Best Buy's arguments and do not represent any kind of

"shifting."  Therefore, these arguments do not create a fact issue about pretext.

### b.   <u>Replacement by Younger Employees Doing the Same Work</u>

Loeb avers that Gilbert's assertion that Loeb's lack of retail experience was

an impediment to his working on the Barry team going forward is not credible

because Gilbert "concealed" the position eventually filled by D.M. from Loeb,

having obtained authorization for the position in October 2004 and never offering

Loeb the opportunity to apply for the job.  Moreover, Loeb argues that nothing in

any job description states that retail experience was necessary for the job.

Likewise, Loeb argues that the Director, Innovation – Barry Segment job did not

have retail experience as a requirement, and thus, the requirement of retail

experience "masks the real reason of intentional discrimination."  (Pl. Mem. Opp.

Mot. Summ. J. at 34.)  Loeb also argues that P.M., the person who eventually got

this job, did not have retail experience.  Furthermore, Loeb argues that he did have retail experience and that Best Buy recognized that when it said that Loeb "leveraged his prior retail experience out of the gate."  (Id. (quoting Shulman Aff. Ex. A).)

Loeb further avers that from the beginning of his employment on the Barry team, Gilbert and Kimberly intended to replace him with a younger person because just one month after he joined the team, his work was "cut off" even thought the rest of the team was busy.  This, coupled with the "youth-based culture" of the Barry team as evidenced by the Barry huddles, insistence on relationship-based work, and having team members grade each other on such criteria as "being a team player," along with the fact that Gilbert asked Loeb his age, indicates that it was the plan all along to terminate Loeb and replace him with younger people.  Loeb avers that his short-term employment on the Barry team was merely a ploy so that the headcount budget allocated to him could be transferred to the Barry team, and that a younger person could be hired to fill that headcount.  To further bolster his argument, Loeb notes that at the time of his termination, Best Buy recommended that the Barry team actually add a program manager position.  Loeb also avers that Kimberly refused to transfer Loeb's headcount to another department after he terminated Loeb, and therefore impeded Loeb's search for other work within Best Buy.

33

Best Buy responds that Loeb has provided no evidence that he had any job duties not related to the Magnolia project.  In addition, Best Buy notes that Loeb has provided no evidence that the added program manager position was somehow a replacement for Loeb's job.  Moreover, that position was just part of a "wish list" and was actually never created.  (Second Gilbert Aff. ¶ 5.)

The Court finds that the Loeb, P.M., and D.M. job descriptions are so broad that they could apply to almost any high level employee on the Barry team, and that during Loeb's employment on the Barry team, the entire team's focus was getting the Magnolia stores up and running.  Thus, it is disingenuous for Loeb to assert that he was the only person with those responsibilities and that when P.M. and D.M. were hired they thus took over his duties.  Moreover, D.M.'s and P.M.'s duties are different from Loeb's former duties.  (Gilbert Aff. ¶¶ 6, 7, 11, 17-19; Kimberly Aff. ¶¶ 4-7, 13-19.)  D.M. actually took over some of the responsibilities that Kimberly was previously handling.  (Gilbert Aff. ¶ 17.)

D.M.'s job involves working "closely with . . . store and field retail people in the brainstorming and innovation of new ideas for . . . . products, services and packages for [the] 'Barry' customer. . . . [T]his is the type of work that [Best Buy] had put into the MHT concept in the months leading up to January, 2004, when [Loeb] joined the team to begin to build the prototype stores."  (Id.)  D.M. worked with field retail employees on "brainstorming, innovation process by which our

34

new concepts, value propositions, were developed." (Kimberly Aff. ¶ 17.) Once the planning was complete, D.M. took over the task of coordinating the designing, building, staffing, and stocking of the new stores. (Id.)

P.M.'s job entails working "on innovations in the sales and sales development aspects of the stand-alone Magnolia project." (Gilbert Aff. ¶ 19.) P.M.'s job was created to "work on certain sales strategies and operational issues." (Kimberly Aff. ¶ 18.)

Loeb makes much of his retail experience, and argues that since he had retail experience, he should have been offered D.M.'s job. D.M. had experience working in Best Buy stores, as well as at the corporate level. (Kimberly Aff. ¶ 16.) Loeb's retail experience consisted of "designing Barry stores; working in Digital Life, a program designed to change the way Best Buy sold home theater equipment; and working in Customer Centricity. However, D.M.'s and P.M.'s jobs benefited from "field retail experience," something that Gilbert did not feel Loeb possessed. (Gilbert Aff. ¶¶ 17, 19.) Both D.M. and P.M. had field retail experience. (Id.; Kimberly Aff. ¶¶ 16-18.)

There is no evidence that Loeb was replaced with younger workers. Loeb has provided no evidence to contradict Best Buy's argument that P.M.'s and D.M.'s work is different work from the work Loeb did on the team. In fact, Loeb does not argue that P.M.'s and D.M.'s duties are the same as his, only that the positions

35

seem "similar."  (Loeb Dep. 146.)   However, to the extent the job descriptions

overlap, they are fairly generic and broad job descriptions, and Loeb has not

specified any particular job duties that D.M. and P.M. actually perform that are

the same duties he performed.  This fact distinguishes this case from the cases

cited by Loeb.  See Keathey, 187 F.3d at 921 (plaintiff's best accounts given to

younger employees);  Hindman, 145 F.3d at 991-92 (younger individuals

performing same work on same machinery upon which plaintiff worked); Hase v.

Missouri Div. Employ. Sec., 972 F.2d 893, 894-95, 897(8th Cir. 1992) (younger

individual who was promoted over plaintiff had lower performance ratings, lower

rank on candidate list, and sixteen years less experience).

Even if it is true that retail experience was not required for the positions or

that Loeb actually had the right kind of retail experience, this fact is not material

because it does not support a finding that Loeb's termination was based on age

discrimination.  There is simply a dearth of evidence to support this contention.

In addition, the Court cannot ignore the fact that although D.M.'s position was

posted both internally and externally, Loeb did not apply for the job.  Employers

are not required to invite former employees to apply when jobs become available

that might be good fits for the former employees.

Lastly, there is no evidence that Kimberly and Gilbert were required to give

up headcount when they terminated Loeb.  Loeb's duties were complete and the

36

MHT project was in scale-up mode, but that does not mean that headcount was not required for the team to perform its other duties.  There is no evidence to support the conclusion that Loeb was brought in merely to shore-up the Barry team's headcount, especially since Loeb was the one who initially approached the team.  Thus, refusing to transfer headcount is not evidence of discrimination.

### c. <u>Replacement by Less Qualified Employees</u>

A finding of pretext may be appropriate when an older employee is replaced by a younger employee with weaker performance and qualifications.  <u>Id.</u> at 897.  Loeb argues that P.M. had engaged in inappropriate behavior at a corporate outing, had a poor performance notice in his file, and therefore was less qualified for his job than Loeb would have been.  Thus, according to Loeb, Best Buy's termination of him was just pretext to replace him with the younger P.M.

The Court finds Loeb's argument unavailing.  First, a comparison between P.M. and Loeb would only be relevant had the Court determined that P.M. actually replaced Loeb, something the Court found did not occur.  Second, Loeb has provided so little evidence regarding P.M.'s work record that the Court cannot reasonably conclude that P.M. was less qualified.  The Court has reviewed Plaintiff's arguments and exhibits, all filed under seal, and concludes that the documents are not relevant regarding whether P.M. was qualified for his current job duties.  The exhibits do not document any on-going issues.  There is no

evidence that the issues addressed in the documents were not resolved to Best Buy's satisfaction.

Best Buy's stated reasons for terminating Loeb were not pretext for age discrimination.  Loeb's position came to an end.  Months later, other people were hired to perform different tasks.  This is not age discrimination.  Whether Loeb should have been considered for these positions because of his prior experience is not a proper question for the Court.  <u>Lewis</u>, 467 F.3d at 1137 (holding that courts should not consider whether employers' decisions are "wise").

### 4.    <u>Conclusion</u>

"[N]ot every plaintiff who sufficiently calls into question the truthfulness of the defendant's proffered explanation survives summary judgment."  <u>Keathly</u>, 187 F.3d at 922 (quotation omitted).  In this case, Loeb has not raised any question of material fact that allows him to survive summary judgment.  Loeb has not proffered any colorable age-based reason for his termination.  Moreover, as discussed above, Loeb failed to even state a prima facie case since he has not provided compelling evidence that he was replaced by younger workers, and the Eighth Circuit has expressed skepticism that even a nine-year age difference

between an employee and his replacement can support a finding of pretext.  <u>See</u>

<u>Girten</u>, 337 F.3d at 982.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** Defendants' Motion for Summary Judgment [Doc.

No. 29] is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: August 6, 2007

s / Michael J.  Davis
Michael J. Davis
United States District Court